# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4403 | **DATE** | 5/30/2002 |
| **CASE TITLE** | LOLA AJAYI vs. ARAMARK BUSINESS SERVICES, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: there is no genuine issue of material fact on any of the claims plaintiff asserts against defendant and defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment is, therefore, granted. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | MAY 3 0 2002 | |
| | Notified counsel by telephone. | date docketed | 52 |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | |
| TBK courtroom deputy's initials | | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LOLA AJAYI,  )
 )
        Plaintiff,  )
 )
v.  )   No. 00 C 4403
 )   Paul E. Plunkett, Senior Judge
ARAMARK BUSINESS SERVICES, INC.,  )
 )
        Defendant.  )

DOCKETED
MAY 3 0 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued defendant for its alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., 42 U.S.C. § 1981 and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., ("ADEA"). The case is before the Court on defendant's Federal Rule of Civil Procedure 56(c) motion for summary judgment. For the reasons set forth below, the motion is granted.

### Facts[1]

Plaintiff, a black woman, was hired by defendant in March 1996 to work as a food service supervisor at defendant's dining facility at the Chicago Christian Industrial League. (Def.'s LR 56.1(a) Stmt. ¶¶ 1, 5.) In August 1998, defendant started to provide dining services to Harris Bank in three facilities: a cafeteria at 111 West Monroe ("111"), a cafeteria at 311 West Monroe ("311") and an executive dining room on the 37th Floor of the 111 West Monroe building. (Id. ¶¶ 10-11.)

---

[1]Unless otherwise noted, the following facts are undisputed.

Defendant's primary contact at Harris Bank was Joseph Mullon. (Id. ¶ 22.) Mr. Mullon, who is black, was an assistant vice president of the bank and was responsible for handling complaints about defendant and its employees. (Id.)

Greg Kaminski, one of defendant's general managers, interviewed and hired plaintiff as front of the house supervisor for 111. (Id. ¶¶ 12, 14.) As front of the house supervisor, plaintiff's duties included supervising the cashiers and making sure that the cafeteria was ready for business. (Id. ¶ 18.) During her tenure at 111, one of the cashiers plaintiff supervised was Lourdes Lopez. (Id. ¶ 20; Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶ 20.) Plaintiff's direct supervisor was Ramiro Lopez. (Def.'s LR 56.1(a) Stmt. ¶ 33.) Plaintiff started work at 111 on August 1, 1998, at a pay rate of $13.00 per hour. (Id. ¶¶ 15,[2] 19.)

The job at 111 was a disappointment to plaintiff. Her subordinates would not follow her instructions. (Id. ¶ 40.) She expected to be, but was not, trained to do cash register readings and to count down the safe and the accounts. (Id. ¶¶ 35-36.) In addition, plaintiff says, Mr. Lopez treated Hispanic employees better than she. He required her, but not Ms. Lopez, to clean and make coffee, he enforced the company's tardiness policy strictly against her but not Ms. Lopez, he permitted Hispanic employees to violate the company policy that forbade employees to punch in before they were in uniform, and ordered that the black cashiers be audited more frequently than the Hispanic cashiers. (Id. ¶¶ 41-44, 70; Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶ 69; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 9-10, 13-14.)

On January 19, 1999, Mr. Lopez gave plaintiff a written warning for insubordination. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 14, 1/19/99 Employee Warning Notice.) On February 4, 1999, Mr.

---

[2]Plaintiff disputes portions of this fact statement, but not the facts cited here.

Lopez gave plaintiff a second written warning for failing to follow instructions and for arriving late for four consecutive days. (Id., Ex. 16, 2/4/99 Employee Warning Notice.) Nonetheless, in March 1999, plaintiff received a $.50 per hour pay increase. (Def.'s LR 56.1(a) Stmt. ¶ 61.)

In July 1999, plaintiff was transferred to 311 and given the job of unit supervisor, a position equivalent to the front of the house supervisor job. (Id. ¶ 71[3]; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 100.) When she transferred, plaintiff was given a written description of the job, which she signed. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 19, 311 Manager's Job Duties.) The description includes targets for food costs (45%), labor costs (40%) and direct costs (14%) and states "[t]hese cost targets are to be met on a monthly basis." (Id.) Around the time of her transfer, Mr. Kaminski told plaintiff that she would have the opportunity to be promoted to food service director of 311 if she was successful in the unit supervisor position. (Def.'s LR 56.1(a) Stmt. ¶ 73.) Throughout her tenure at 311, Mr. Lopez continued to be plaintiff's direct supervisor. (Id. ¶ 33.)

Though plaintiff disputes it, defendant says that she did not meet the cost targets set forth in the unit supervisor job description. (Id. ¶¶ 78-81.) As a result, defendant says, plaintiff was not promoted to the food service director job. (Id. ¶ 82.)

On November 1999, defendant received via facsimile an anonymous memorandum on Harris Bank stationery that said black cafeteria customers were treated less well than non-black customers, particularly by a cashier named Lourdes. (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 10, 11/4/99 Mem. to Cafeteria Manager from A Very Disappointed Customer.) Neither Mr. Mullon nor Mr. Kaminski found any evidence to substantiate the complaints made in the memo. (Pl.'s Second

---

[3]Plaintiff disputes portions of this fact statement, but not the facts cited here.

Supplemental Set Exs., Ex. 2S, Kaminski Dep at 172-74; Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 4, Mullon Dep. at 47-48, 56-57.)

In December 1999, defendant decided to eliminate plaintiff's position and demote her to lead cashier at a pay rate of $8.00 per hour. (Def.'s LR 56.1(a) Stmt. ¶ 91.[4]) On January 24, 2000, plaintiff was told that her position was going to be eliminated, and on February 9, 2000 she received a memo to that effect. (Id. ¶ 92; Exs. Supp. Def.'s Mot. Summ. J., Ex. 24, 2/9/00 Mem. to Ajayi from Sams.) However, the planned demotion never took place. (See Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 1, Ajayi Dep. at 158.)

On February 14, 2000, plaintiff filed a charge of discrimination with the EEOC. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 25, 2/14/00 EEOC Charge.) In the charge, plaintiff says that defendant discriminated and retaliated against her because she is black. (Id.)

Sometime between early April and early May 2000, Mr. Mullon says he received several complaints from cafeteria customers about plaintiff. (Def.'s LR 56.1(a) Stmt. ¶ 104.) Though plaintiff disputes it, he says he relayed those complaints verbally to defendant. (Id. ¶ 105.)

On April 26, 2000, plaintiff received a dismissal and notice of right to sue from the EEOC. (Id. ¶ 103.)

On May 1, 2000, plaintiff completed a vacation request form, requesting vacation from May 3 to 16, 2000, despite the company's policy of requiring employees to request vacation two weeks in advance. (Id. ¶ 107; Exs. Supp. Def.'s Mot. Summ. J., Ex. 12, App. Hourly Employee Handbook at D00133.) The policy also requires supervisor approval of all vacation requests. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 12, App. Hourly Employee Handbook at D00133.) The parties dispute

---

[4]Plaintiff disputes portions of this fact statement, but not those cited here.

-4-

whether Mr. Lopez ever approved plaintiff's request. (Compare Def.'s LR 56.1(a) Stmt. ¶ 107 with Pl.'s LR 56.1(b)(3)(B) Stmt. 72.)

On May 2, 2000, a third written warning was prepared for plaintiff. The warning says that Harris Bank had expressed dissatisfaction with plaintiff's work, that she would be suspended from May 3 to 5, 2000, and then demoted to cashier. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 29, 5/2/00 Employee Warning Notice.) Defendant was unable to find plaintiff on May 2, 2000 to give her the warning. (Id. ¶ 110).

Plaintiff went on vacation from May 3, 2000 until May 17, 2000. (Def.'s LR 56.1(a) Stmt. ¶ 111.[5])

Sometime before May 17, 2000, Mr. Kaminski asked Mr. Mullon to prepare a memorandum documenting the complaints he had received about plaintiff. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 61.)

Plaintiff returned to work on May 17, 2000, at which point she was given the third warning and suspended. (Def.'s LR 56.1(a) Stmt. ¶ 113.) The same day, Mr. Mullon sent Mr. Kaminski the memorandum he had previously requested. (Id. ¶ 118.)

On May 19, 2000, defendant sent a letter to plaintiff terminating her employment because of Mr. Mullon's complaints and plaintiff's violation of the vacation policy. (Id. ¶ 125; Exs. Supp. Def.'s Mot. Summ. J., Ex. 33, 5/19/00 Letter to Ajayi from Kaminski.) Plaintiff did not receive the letter, however, until the evening of May 22, 2000. (Def.'s LR 56.1(a) Stmt. ¶ 129.)

When plaintiff reported to work on May 22, 2000, she gave Kaminski a resignation letter and was told that she was fired. (Id. ¶ 128; Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶ 128.)

---

[5]Plaintiff disputes portions of this fact statement, but not those cited here.

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. Id.

## Discussion

In the last two counts of her complaint, plaintiff alleges that defendant violated the ADEA. That statute, however, makes filing a charge of age discrimination with the EEOC a condition precedent to filing an ADEA claim. See 29 U.S.C. § 626(d) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission.") There is nothing in plaintiff's EEOC charge that even implies the existence of her age claim. (See Exs. Supp. Def.'s Mot. Summ. J., Ex. 25, 2/14/00 EEOC Charge.) It does not state her age, the ages of any other employees who allegedly received more favorable treatment or any other facts that might have alerted the EEOC to the claim. (Id.) Moreover, there is reason in law or logic why the EEOC's investigation into

plaintiff's race discrimination charge[6] would have uncovered the alleged age bias. Because plaintiff did not raise her age claims before the EEOC, either explicitly or by implication, they must be dismissed. Cheek v. Western & So. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994) (EEOC charge encompasses claims not explicitly raised in it "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.")[7]

In Counts I-III of her complaint, plaintiff alleges that defendant discriminated against her in violation of Title VII and section 1981.[8] Title VII prohibits employment discrimination on the basis of race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2. Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[9] 42

---

[6]The charge actually alleges discrimination on the basis of national origin. Like the parties, however, the Court construes the charge as a claim of race discrimination.

[7]Contrary to plaintiff's belief, not all retaliation claims that arise after a charge of discrimination is filed with the EEOC are necessarily related to the charge. Rather, only those retaliation claims that arise from the "same course of conduct as that alleged in [the] EEOC filing" are related to it. Malarkey v. Texaco, Inc., 983 F.2d 1204, 1209 (2d Cir. 1993). Had plaintiff alleged age discrimination in her EEOC charge, her ADEA retaliation would be related to it. Having failed to do so, however, the fact that her ADEA retaliation claim arose after she filed her EEOC charge does not save it.

[8]In reality, plaintiff alleges only a section 1981 retaliation claim. (See Compl., Count III.) But, because we cannot tell from her brief what claims she raises under which statute, we will assume that she intends to raise all of her discrimination and retaliation claims under both statutes.

[9]The record suggests that plaintiff was an at-will employee. The Seventh Circuit has not yet decided whether section 1981, in its post-Civil Rights Act of 1991 incarnation, applies to at-will employment relationships. But compare McKnight v. General Motors Corp., 908 F.2d 104, 109 (7th Cir. 1990) (describing employment at will as "a continuing contractual relation" in which all of the terms but duration are specified) with Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1035

U.S.C. § 1981 (a)-(b). "While section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." Von Zuckerstein v. Argonne Nat'l Lab., 984 F.2d 1467, 1472 (7th Cir. 1993).

To defeat defendant's motion, plaintiff must either present some direct evidence of defendant's discriminatory intent or comply with the indirect, burden-shifting method of proof articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Cheek v. Peabody Coal Co., 97 F.3d 200, 203 (7th Cir. 1996). Having no direct evidence of discrimination, plaintiff must satisfy the McDonnell Douglas burden-shifting method of proof if she is to defeat this motion. To do so, she must first establish a prima facie case of discrimination. Von Zuckerstein, 984 F.2d at 1472. If plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment decisions. Id. If defendant carries its burden, plaintiff must show that the proffered reasons for the challenged employment decisions are merely a pretext. Id.

To establish a prima facie case on her discrimination claims, plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the job or was meeting defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) defendant treated similarly situated employees outside the protected class more favorably. Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1035 (7th Cir. 1999). Defendant contends that there is no evidence that plaintiff suffered any adverse employment action.

---

(7th Cir. 1998) (expressing doubts that "employment at-will provides a sufficient contractual relationship to support section 1981 claims"). Though defendant does not argue the point, for the reasons set forth in Spriggs v. Diamond Auto Glass, 165 F.3d 1015 (4th Cir. 1999), we hold that section 1981 is applicable to this at-will employment relationship.

The term adverse employment action refers only to those actions that cause "a materially adverse change in the terms or conditions of . . . employment." Spring v. Sheboygan Sch. Dist., 865 F.2d 883, 885 (7th Cir.1989). "A materially adverse change might be indicated by a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir.1993) (citations omitted). Though the term is interpreted broadly in this circuit, "not everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State Univ., 89 F.3d 437, 441-42 (7th Cir.1996) (holding that "negative performance evaluations alone do not constitute an actionable adverse employment action"); Crady, 993 F.2d at 135-36 (holding that lateral transfer to job with same salary, benefits and level of responsibility was not an adverse employment action); Spring, 865 F.2d at 886 (holding that reassignment of school principal, which did not negatively impact responsibilities or salary, was not adverse employment action under ADEA).

In her EEOC charge, plaintiff identifies defendant's discriminatory actions as: (1) denying her training; (2) denying her a promotion; and (3) demoting her. (See Exs. Supp. Def.'s Mot. Summ. J., Ex. 25, 2/14/00 EEOC Charge.) In her deposition, plaintiff expanded the list to include: (4) defendant's practice of auditing black cashiers more frequently than non-black cashiers; (5) Mr. Lopez's inquiry about her handling of a time card situation with one of the cashiers; (6) Mr. Kaminski's statement in a 1999 meeting that she and Mr. Lopez were incompatible and that the company would not contest her unemployment claim if she wished to quit; (7) defendant's strict enforcement of the company tardiness policy against plaintiff but not against Hispanic employees;

(8) defendant's requirement that plaintiff perform duties not required of Ms. Lopez; (9) her subordinates' failure to follow her instructions; (10) Mr. Lopez's authorization of overtime for a Hispanic employee at a time when the employees were told that overtime was not allowed; (11) Mr. Lopez's failure to reprimand Ms. Lopez for improper conduct; and (12) Mr. Lopez's destruction of customer comment cards that contained negative comments about Ms. Lopez. (Def.'s LR 56.1(a) Stmt. ¶ 131; Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶ 131.) Finally, in her response brief, plaintiff brings the total to thirteen (13), by adding her termination to the list. (See Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 6.)[10]

There is no evidence to suggest that nine of those thirteen actions – the denial of training, the discriminatory auditing practice, Mr. Lopez's inquiry about plaintiff's handling of a cashier time card situation, Mr. Kaminski's statement that the company would not contest her unemployment claim if she wished to quit, defendant's selective enforcement of the tardiness policy, her

---

[10]Defendant contends that plaintiff cannot proceed on the last ten of these actions because they are beyond the scope of her EEOC charge. With one exception, we disagree. Nine of the ten actions apparently occurred before the charge was filed and allege the same kind of disparate treatment at the hands of the same supervisors as the actions listed in the charge. Because these claims would likely have grown out of the EEOC's investigation into plaintiff's charge, they are actionable even though they were not included in the charge. Cheek v. Western & So. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). The exception is her discharge, which occurred nearly a month after the EEOC completed its investigation into plaintiff's charge. (See Def.'s LR 56.1(a) Stmt. ¶¶ 103, 128.) Because of the timing, that claim could not possibly have grown out of the EEOC's investigation. Moreover, allowing plaintiff to tack that claim onto her earlier charge would frustrate the purposes of the charge filing requirement. See id. (stating that filing requirement was designed to facilitate settlement and provide employer with fair warning of challenged conduct). Thus, plaintiff cannot base a Title VII discrimination claim on her discharge. The discharge claim may, however, still be actionable under section 1981, which has no EEOC filing requirement. As a result, we have included it in the list of allegedly discriminatory actions.

subordinates' failure to follow her instructions,[11] Mr. Lopez's authorization of overtime for a Hispanic employee at a time when overtime was prohibited,[12] Mr. Lopez's failure to reprimand Ms. Lopez for improper conduct and his destruction of comment cards that had negative comments about Ms. Lopez – had any tangible, negative impact on her employment. Those actions did not end plaintiff's employment, cost her a promotion, decrease her wages, benefits or material responsibilities, or otherwise adversely affect any term or condition of her job. Absent evidence of adverse impact, none of those actions can support a Title VII or section 1981 discrimination claim.

Of the four remaining actions, three of them – the failure to promote, the demotion and the discharge – are paradigm adverse employment actions. Defendants' requirement that plaintiff make coffee and do some cleaning, however, is not. Certainly, a material change in job duties can be an adverse employment action, but there is no evidence that plaintiff suffered such a change. Plaintiff does not assert that those duties were not in her job description, that non-black front of the house supervisors were not required to perform them, or that those tasks are generally considered beneath someone of her rank. She says only that she should not have been required to perform those tasks because Ms. Lopez was not required to perform them. It is undisputed, however, that at the time those tasks were assigned to plaintiff, she and Ms. Lopez had different job titles. (Def.'s LR 56.1(a) Stmt. ¶¶ 15, 18, 20; Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶¶ 15, 18, 20; Exs. Supp. Pl.'s Resp. Def.'s

---

[11]Even if her subordinates' failure to follow her instructions were an adverse action, there is no evidence that it is attributable to defendant. Plaintiff has produced no facts to suggest that defendant instructed her subordinates to disregard her instructions or took any other action to undermine her authority.

[12]There is no evidence that plaintiff requested, or even desired, overtime work during this period.

-11-

Mot. Summ. J., Ex. 1, Ajayi Dep. at 97, 128-29.) The fact that defendant assigned different duties to employees in different job titles does not support an inference of adverse action.

We turn now to the demotion. Though a demotion unquestionably constitutes an adverse action, there is no evidence in this case that one actually occurred. It is undisputed that plaintiff received a memo from defendant on February 9, 2000, saying that her position as 311 unit supervisor, which paid $13.50 per hour, was going to be eliminated and she would be demoted to the position of lead cashier, which paid only $8.00 per hour. (Def.'s LR 56.1(a) Stmt. ¶¶ 61, 71, 91-93; Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶¶ 61, 71, 91-93[13]; Exs. Supp. Def.'s Mot. Summ. J., Ex. 24, 2/9/00 Mem. to Ajayi from Sams.) But, as plaintiff testified:

> [T]hey never did change anything. They said, you know, it will go into effect, my pay will change and everything. I went to EEOC. After going to EEOC they never told me about it. They never mentioned this memo no more about, nothing about this memo to me. I go in there, I do my job, I do everything that I was told to do. Nothing changed.

(Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 1, Ajayi Dep. at 158.) An unfulfilled threat to demote, which, by plaintiff's admission, is all that the February 9, 2000 memo was, does not constitute an adverse employment action.[14] See, e.g., Spring, 865 F.2d at 885 (adverse employment action contemplates materially adverse change in the terms or conditions of employment).

---

[13]Plaintiff disputes portions of paragraphs 71 and 91 of defendant's fact statement, but not those cited here.

[14]In May 2000, defendant again threatened to demote plaintiff. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 29, 5/2/00 Employee Warning Notice.) Plaintiff, however, was discharged before the demotion took effect. (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 1, Ajayi Dep. at 214-15.) Because this second threatened demotion was another unfulfilled threat, it is also not an adverse employment action.

That leaves the failure to promote and the discharge. There is no question that both are adverse employments actions, so the third element of plaintiff's prima facie case on these claims is met. Nor is there a dispute that plaintiff is a member of a protected class, so the first element is also met. Where both claims falter is on the fourth element, which requires some proof that defendant treated similarly situated employees outside the protected class more favorably. See Foster, 168 F.3d at 1035 (7th Cir. 1999) (discussing elements of prima facie case).

With respect to the promotion claim, there is no evidence that a non-black unit supervisor who had not met the profitability targets was promoted to the position of food service director.[15] While it is true that Mr. Bluck and Mr. Sams, who performed the 311 food service director job at various times, and Mr. Bondi, Mr. Lopez and Mr. Kaminski, who all had supervisory authority over plaintiff, also bore some responsibility for meeting the profitability targets, that fact does not advance plaintiff's cause. First, those individuals held different job titles, and thus, were not situated similarly to plaintiff. See Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002) ("To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable in all material respects."). Second, even if they

---

[15]Plaintiff says that it is not clear she failed to meet the targets because defendant's computer records contradict the spreadsheet defendant tendered to illustrate that point. (See Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶¶ 78-82.) In fact, the computer records, for which plaintiff has provided no explanation, and the spreadsheet appear to diverge on only two points: (1) the spreadsheet shows total sales for 311 in July 1999 as $38,607, while the computer records show a total of $38,475; and (2) the spreadsheet shows total sales for 311 in August 1999 as $41,542, while the computer records show a total of $41,561. (Compare Exs. Supp. Def.'s Mot. Summ. J., Ex. 21 with Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 27 at D00663-69.) The first error slightly increases the cost percentages for July 1999 and the second error slightly decreases the cost percentages for August 1999. Neither error, however, brings the costs in line with the targets set forth in the 311 unit supervisor job description. (See Exs. Supp. Def.'s Mot. Summ. J., Ex. 19, 311 Manager's Job Duties.)

were, there is no evidence that defendant promoted them after they failed to meet the profitability targets. In short, plaintiff has not made a prima facie case on her failure to promote claims. Defendant's motion for summary judgment on these claims is, therefore, granted.

Plaintiff fares no better with her discharge claims. Plaintiff identifies Ms. Lopez, who became a front of the house supervisor sometime before May 4, 2000 (see Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 33 at D00214), as a similarly situated, non-black employee whom defendant retained. Ms. Lopez and plaintiff are situated similarly, however, only if they "dealt with the same supervisor, were subject to the same standards, and . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or [defendant's] treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). The record shows, however, that Ms. Lopez did not engage in the same conduct as plaintiff. Mr. Mullon testified that he had received and relayed to Mr. Kaminski numerous complaints about plaintiff's conduct, including his own observations of her inappropriate conduct. (See Exs. Supp. Def.'s Mot. Summ. J., Ex. 4, Mullon Dep. at 41-45, 57-60, 63-64.) Plaintiff says that his story is contradicted by Mr. Kaminski, who testified that he had received only two complaints from Mr. Mullon. (See Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶ 23.) In reality, Mr. Kaminski testified that Mr. Mullon complained to him on two different occasions about plaintiff's conduct, not that he received only two complaints from Mr. Mullon. (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 2, Kaminski Dep. at 57-68.) In fact, Mr. Kaminski said that on the second occasion Mr. Mullon relayed several complaints to him, including that "he had observed [plaintiff] act rudely toward some of the customers" and that "he had received other complaints from other Harris Bank employees regarding [plaintiff's] behavior." (Id. at 61-62.) Thus, Mr. Mullon's testimony that he relayed numerous

complaints about plaintiff to Mr. Kaminski stands unrefuted. By contrast, Mr. Mullon never complained to Mr. Kaminski about Ms. Lopez's conduct.[16] (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 4, Mullon Dep. at 53.)

Moreover, there is no evidence that Ms. Lopez violated defendant's vacation policy, while the record establishes that plaintiff did. It is undisputed that company policy requires an employee to: (1) submit a written vacation request; (2) two weeks before an anticipated vacation; and (3) obtain her supervisor's approval before taking the vacation. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 12, App. Hourly Employee Handbook at D00133; id., Ex. 5, Kaminski Dep. at 42-43; Def.'s LR 56.1(a) Stmt. ¶ 52; Pl.'s Am. LR 56.1(b)(3)(A) Stmt. ¶ 52.) It is also undisputed that the first two requirements were not always enforced. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 5, Kaminski Dep. at 42-43; Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 30, Ajayi Aff. ¶¶ 11-12.) Nonetheless, defendant says that the last requirement, that the employee obtain her supervisor's approval in some manner before taking a vacation, was strictly enforced. (See Exs. Supp. Def.'s Mot. Summ. J., Ex. 5, Kaminski Dep. at 42-43.) Plaintiff contends that she complied with that requirement. She says that Mr. Lopez approved vacation requests by not disapproving them; that is, Mr. Lopez's silence constituted approval. (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 1, Ajayi Dep. at 169.) Mr. Lopez's failure to tell her that her request was disapproved, plaintiff says, was de facto approval of the request.

---

[16]Defendant did receive a memo from an anonymous Harris Bank cafeteria customer ostensibly complaining about Ms. Lopez. Mr. Mullon testified, however, that he was not the source of the memo, he was unable to substantiate the complaints in it and was not even certain that the Lourdes about whom it complained was Ms. Lopez. (Exs. Supp. Pl.'s Resp. Mot. Summ. J., Ex. 4, Mullon Dep. at 47-48, 53, 56-57.) Thus, it does not contradict defendant's claim that Mr. Mullon did not complain about Ms. Lopez.

The fact that Mr. Lopez's silence usually signaled approval, however, only helps plaintiff if Mr. Lopez was silent in the face of her vacation request. The record establishes that he was not. When plaintiff gave her vacation request to him, Mr. Lopez told her "that it needed to be approved" and that "she couldn't come in 2 days before [her] vacation time and expect to have [it] approved." (Id., Ex. 3, R. Lopez Dep. at 113-14.) He also testified that he never approved the request. (Id. at 113.) That testimony, which plaintiff has not disputed, squarely refutes her contention that she obtained, via Mr. Lopez's silence, his approval of her May 1, 2000 vacation request.[17]

In short, plaintiff has not demonstrated that Mr. Mullon was dissatisfied with Ms. Lopez's conduct or that Ms. Lopez violated defendant's vacation policy. Thus, Ms. Lopez is not situated similarly to plaintiff. Because plaintiff has not demonstrated that defendant retained a similarly situated employee outside of the protected class, her discriminatory discharge claims must be dismissed.

We turn now to the retaliation claims plaintiff asserts in Counts II and III. To make a prima facie case on these claims, plaintiff must show that she engaged in protected activity, she suffered an adverse employment action and there is a causal link between the two. Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1035 (7th Cir. 1998). There is no dispute that plaintiff filed an EEOC claim on February 14, 2000, so the first element is met. (Exs. Supp. Def.'s Mot. Summ. J., Ex. 25, 2/14/00 EEOC Charge.) There is also evidence that she was subsequently suspended and

---

[17] Plaintiff's only testimony on the subject was that "[she] put in [her] request for a vacation, and as usual, [Mr. Lopez] never said yes or no." (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 1, Ajayi Dep at 169.) That testimony does not controvert Mr. Lopez's claim that he explicitly told her on this occasion that the request had to be approved and likely would not be because of the short notice.

discharged, so the second element is met. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 76, 81.) The only question is whether there is any evidence to suggest that there is a causal link between the two.

As plaintiff points out, Mr. Kaminski decided that she should be suspended only a few days after he learned that the EEOC had concluded its investigation of her charge. (See Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 50-52.) In addition, she says that he made the following comments to her when she returned to work on May 17, 2000: "Oh, you left. Is it because Miss Winters [of the EEOC] did not find anything, that's why you ran out of here?" and "Are you going to stand there and act like you didn't know that you sued me?" (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 1, Ajayi Dep. at 231-32.) Taken together, the sequence of events and Mr. Kaminski's comments are sufficient to raise an inference of causation. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 797 (7th Cir. 1997) (noting that an inference of causation can arise from timing alone if the protected activity and the adverse action are separated by only a few days).

Plaintiff still cannot defeat this motion, however, because she has no evidence to suggest that defendant's proffered reasons for its actions, its receipt of complaints from Mr. Mullon and her violation of the company's vacation policy, are pretextual. As we noted above, it is undisputed that Mr. Mullon relayed multiple complaints about plaintiff's conduct to Mr. Kaminski and witnessed plaintiff behave in a manner that he thought was improper. (Exs. Supp. Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 4, Mullon Dep. at 41-45, 58-60, 63-64; id., Ex. 2, Kaminski Dep. at 58.) Moreover, plaintiff has no evidence, such as testimony that defendant generally disregarded its clients' complaints, to suggest that the complaints were not the true reason for her discharge. Absent such evidence, plaintiff has not created a genuine issue for trial on pretext.

There is also no evidence that the second reason for the adverse actions, plaintiff's violation of the vacation policy, was a pretext. As we noted above, the record establishes that plaintiff, in fact, violated the vacation policy. (See supra at 15-16.) Plaintiff contends, however, that there is evidence the violation was not the real reason for her discharge. The employee handbook, she says, states that an employee will be suspended only after a third offense in a one-year period and will be discharged only after a fourth. The fact that she did not meet these criteria for suspension or discharge, she argues, casts doubt on defendant's stated reasons for its actions.

Plaintiff's argument is based on misreading of the employee handbook. The handbook states that certain kinds of conduct may result in the progressive discipline that plaintiff describes. (See Exs. Supp. Def.'s Mot. Summ. J., Ex. 11, Hourly Employee Handbook at D00153.) It also states, however, that various other kinds of conduct, including "[a]bsence without prior notice to, and approved, by the Company or without reasonable excuse," may result in suspension or discharge. (Id. at D00152-53.) Thus, there is no evidence that defendant disregarded its personnel policies when it suspended and discharged plaintiff. Because plaintiff has no other evidence of pretext, defendant's motion for summary judgment on her retaliatory discharge claims is granted.

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact on any of the claims plaintiff asserts against defendant and defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment is, therefore, granted. This is a final and appealable order.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

DATED: May 30, 2002